**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF KENTUCKY**
**CENTRAL DIVISION**
**LEXINGTON**

| | |
|---|---|
| **UNITED STATES OF AMERICA,** ) | |
| ) | |
| ) | |
| **Plaintiff,** ) | |
| ) | |
| v. ) | **NO. 5:25-CR-00087-REW-MAS** |
| ) | |
| **JEROME ZACHARY NEWTON,** ) | |
| **JR.,** ) | |
| ) | |
| ) | |
| **Defendant.** ) | |

**MEMORANDUM OPINION & ORDER**

The Indictment alleges that Defendant Jerome Zachary Newton, Jr. ("Newton") conspired to possess with intent to distribute fentanyl or a fentanyl analog in violation of 21 U.S.C. 846; and that he aided and abetted the possession with intent to distribute fentanyl or a fentanyl analog in violation of 21 U.S.C. § 841(a)(1) and 18 U.S.C. § 2. [DE 1]. The United States properly moved for detention under 18 U.S.C. § 3142(f)(1)(B) and (C). Based on the testimony, proffer, arguments, and the Pretrial Services Report ("PSR") tendered by the United States Probation Office, the Court finds that Newton's release poses an irremediable risk of danger to the community and accordingly grants the government's motion for detention for the reasons explained below.

## I. ANALYSIS

### A. LEGAL STANDARD FOR DETENTION UNDER THE BAIL REFORM ACT

The Court afforded both sides all procedural rights outlined in the Bail Reform Act ("BRA"). A detention presumption arises under the BRA as to both nonappearance and danger risk because of the nature of the charges. 18 U.S.C. § 3142(e)(3)(A). The BRA and *United States v. Stone*, 608 F.3d 939, 945–46 (6th Cir. 2010), frame the resulting inquiry. The presumption imposes on the defendant a threshold "burden of production"; in response, "he must introduce at least some evidence" that he poses neither a nonappearance nor a danger risk. *Stone*, 608 F.3d at 945; *see also United States v. Dominguez*, 783 F.2d 702, 707 (7th Cir. 1986) (imposing a responsive burden on the defendant to produce "some evidence that he will not flee or endanger the community if released"); *United States v. Hernandez*, No. 1:02-CR-006, 2002 WL 1377911, at *2 (E.D. Tenn. Feb. 27, 2002) (requiring the defendant to "produc[e] probative, credible evidence to rebut the presumption and support his contention that he will appear . . . and [that] he does not pose a danger"). The production burden "is not heavy," and the Government retains the ultimate burden of persuasion. *Stone*, 608 F.3d at 945. An unrebutted presumption requires detention. A rebutted presumption remains a pro-detention statutory factor. *See id.* ("The presumption remains as a factor because it . . . reflects Congress's substantive judgment that particular classes of offenders should ordinarily be detained prior to trial.").

The facts in Newton's proffer and the bond report, described below, provided sufficient evidence to overcome the presumption as danger. Thus, the burden shifted

back to the United States to prove detention was warranted based on either nonappearance risks or danger to the community. Detention premised on nonappearance requires preponderant evidence. *See, e.g.*, *United States v. Patriarca*, 948 F.2d 789, 793 (1st Cir. 1991); *United States v. Curry*, No. 6:06-CR-82-DCR, 2006 WL 2037406, at *6 (E.D. Ky. Jul. 18, 2006). Danger-based detention, however, demands clear and convincing evidence that no combination of conditions will reasonably ensure community safety. 18 U.S.C. § 3142(f). The analyses are distinct. Conditions that sufficiently target nonappearance risk may not adequately address danger potential. *See United States v. Mercedes*, 254 F.3d 433, 436-37 (2nd Cir. 2001). Further, condition effectiveness inherently hinges on a defendant's predicted good faith compliance. *See United States v. Tortora*, 922 F.2d 880, 887 (1st Cir. 1990) (characterizing predicted compliance as critical release component); *United States v. Hir*, 517 F.3d 1081, 1092 (9th Cir. 2008) (noting the "critical flaw" in a set of proposed release conditions: "In order to be effective, they depend on [the defendant's] good faith compliance."); *id.* at 1093 n.13 (observing that, barring a "replica detention facilit[y]," the success of any condition combination necessarily "hinge[s] on [the defendant's] good faith compliance").

Evidence rules do not apply in the detention hearing context. 18 U.S.C. § 3142(f). The key is simply evidentiary reliability and accuracy. *See, e.g.*, *United States v. Webb*, 149 F.3d 1185 (Table), No. 98-1291, 1998 WL 381686, at *1 (6th Cir. June 22, 1998). Given the hearing's informality, the Court properly considers a wide

range of proof. The nature and quality of proof, though, impacts its probative value and weight in the detention calculus.

B.  **NEWTON'S DANGER TO THE COMMUNITY**

    1.  **Newton's History and Characteristics**

The Court must consider many aspects of Newton's background in making the decision to release or detain him. Specifically, the BRA requires courts to "take into account the available information concerning— [ . . . ] the person's character, physical and mental condition, family ties, employment, financial resources, length of residence in the community, community ties, past conduct, history relating to drug or alcohol abuse, criminal history, and record concerning appearance at court proceedings; and (B) whether, at the time of the current offense or arrest, the person was on probation[.]" 18 U.S.C. § 3142(g)(3).

Newton is a lifelong resident of Cincinnati, Ohio. [PSR at 1–2]. Throughout his life, he has primarily resided with his mother and has lived continuously with her since 2023. [PSR at 2]. He reports that he was employed from November 2023 until his arrest in April 2025 on state charges related to the conduct underlying the Indictment. [PSR at 2].

Newton has had multiple contacts with the criminal justice system, beginning with a 2012 trafficking conviction in Kentucky. [PSR at 4]. He was released after serving nearly six months in custody but later violated his parole, resulting in his return to prison in 2015. He was ultimately released in February 2016. Following his release, Newton incurred several traffic and misdemeanor-level offenses before his conduct escalated to a federal indictment in November 2021 in the Southern

District of Ohio. In that case, he was charged with distributing fentanyl. The government alleged that he was a distributor within a drug trafficking organization and sold 5.32 grams of fentanyl to a confidential source. He was convicted and sentenced to time served (720 days) and three years of supervised release. When Newton was later arrested on the state charges underlying the present federal Indictment, the Southern District of Ohio issued a warrant upon allegations that he violated the terms of his supervision.

Newton's criminal history, particularly his prior involvement in trafficking dangerous controlled substances like fentanyl, indicates that the allegations in the present Indictment are not an isolated occurrence. He has previously been convicted of participating in a distribution scheme involving similarly lethal substances. At the time of the charged conduct, Newton was on federal supervision, and there is an active warrant for his arrest on allegations that he violated the terms of his supervision because of the Indictment.

   2.   **The Offense Charged**

The United States offered proffer and proof regarding Newton's alleged drug trafficking activities, mostly through the testimony of FBI Special Agent Thompson Hagan ("SA Hagan"). According to SA Hagan, the investigation began in late March 2025 when a confidential witness, referred to as Witness 1, was introduced to Newton's co-defendant, Craig Martez Williams, through a third party. In recorded conversations—both audio and video—Williams allegedly discussed selling kilograms of carfentanyl, initially quoting a price of $85,000 before agreeing to $65,000 for two kilos. During a FaceTime call recorded and later obtained by the government,

Williams appears to display a kilogram of narcotics. Notably, in one conversation between Witness 1 and Williams, Williams references an obituary and suggests that an associate died after exposure to the narcotics, presumably due to their potency.

According to SA Hagan, after the recorded negotiations, Witness 1 arranged to obtain a sample of the product. On April 1, 2025, Witness 1 met Williams at a sports bar in Cincinnati, where they remained for several hours before Williams led Witness 1—who followed in a separate vehicle—to Craig Avenue. There, Newton emerged from a nearby townhouse carrying a backpack and approached both Williams and Witness 1. SA Hagan identified Newton as the individual with the backpack based on his distinctive dreadlocks and confirmed his identity through surveillance and witness corroboration. Newton interacted briefly with both men and allegedly supplied the sample from the backpack's contents. SA Hagan testified that the backpack also contained two kilograms of suspected fentanyl and carfentanyl intended for later delivery.

The next day, Witness 1 arranged for the transaction to occur in Lexington, Kentucky. Williams and Newton traveled to Sedona Taphouse in Lexington, where they met with Witness 1. Although the drugs were not present at that location, a FaceTime call connected the group to co-defendant Adrian Lattimore, who was parked nearby at a Walmart and later moved to the parking lot of Divas Gentlemen's Club. Surveillance footage captured Newton and Williams meeting Lattimore in the parking lot, where Lattimore transferred a bag from his vehicle into the white Nissan that Williams and Newton had arrived in. Afterward, both Williams and Newton

entered Divas. SA Hagan testified that no one interacted with the vehicle, and in particular the back two doors, after the bag was placed inside. Shortly thereafter, law enforcement detained Newton and Williams and recovered the bag from the backseat of the Nissan, which, in plain view, contained two suspected kilograms of fentanyl and carfentanyl. Lab testing confirmed the presence of both substances.

Although the Court has found that Newton rebutted the presumption that attaches to these types of allegations, "[t]he presumption in favor of detention does not vanish simply because a defendant comes forward with evidence to rebut it. Were the presumption to vanish, 'courts would be giving too little deference to Congress' findings regarding this class.'" *United States v. Lattner*, 23 Fed. App'x. 363, 364, (6th Cir. 2001) (citing *United States v. Martir*, F.2d 1141, 1144 (2d. Cir. 1986)). The evidence offered by the United States suggests that Newton was not merely a bystander to this transaction, but an active participant. SA Hagan testified that Newton may have not spoken on the audio recordings evidencing Williams and Witness 1 discussing the narcotics, but that a cooperating witnesses verified Newton's physical presence during those conversations. Moreover, SA Hagan testified that Newton was transported the narcotics during the initial meet-up on Craig Avenue where Witness 1 received the product sample. These charges, and the circumstances surrounding them strongly in favor of detaining Newton.

### 3. The Weight of the Evidence of Dangerousness

In weighing the strength of the evidence, the district court may not modify or limit the defendant's presumption of innocence. 18 U.S.C. § 3142(g). "[T]he § 3142(g) analysis is concerned with a practical assessment of the defendant's dangerousness,

rather than an adjudication of guilt for a particular offense." *United States v. Tolbert*, 2017 WL 6003075, at *5 (E.D. Tenn. Dec. 4, 2017) (citing Stone, 608 F.3d at 948).

This BRA factor is somewhat duplicative of § 3142(g)(1) and (3) because in considering a defendant's overall dangerousness, the Court must consider the facts of the crime alleged as well as evidence that the defendant has been dangerous in the past, such as criminal history and a history of violent behavior. Newton's criminal history reflects a pattern of violence and escalating criminal conduct. Not only was he on federal supervision for a serious drug trafficking conviction when the current offenses occurred, but the evidence of his involvement in the alleged scheme of trafficking highly dangerous narcotics is substantial. Both the aggravating nature of his prior trafficking convictions and the strength of the government's case support a finding that the weight of the evidence strongly favors danger-based detention.

### 4. The Nature and Seriousness of Danger Posed by Release

The Court must weigh "the nature and seriousness of the danger to any person or the community that would be posed by the person's release." 18 U.S.C. § 3142(g)(4). In cases involving drug trafficking, courts have repeatedly recognized the grave threat such conduct poses to the community. *See, e.g.*, *United States v. Flowers*, No. 3:05-CR-72, 2005 WL 1981364, at *4 (E.D. Tenn. Aug. 17, 2005) (noting that the "sale of drugs [ ] establish[es] a significant danger"); *United States v. Pina-Aboite*, 97 F. App'x 832, 836 (10th Cir. 2004) ("[T]he danger-to-the-community factor is not simply about physical violence; the risk that a defendant will continue to engage in drug trafficking constitutes a danger to the community[.]").

The United States contends that Newton poses an unmitigable danger to the community, emphasizing both the lethality and volume of the controlled substances involved and Newton's role in the trafficking operation. SA Hagan testified that carfentanyl is among the most dangerous controlled substances. He also testified that it was Newton that supplied the product sample to Witness 1, and that Newton had two kilograms of narcotics in his backpack during Craig Avenue rendezvous with Witness 1. And while he did not speak to Witness 1 on certain audio recordings the government introduced into evidence, SA Hagan testified that Newton was physically present for those conversations involving discussions of the dangerousness and potency of the narcotics which they were promoting. Newton's involvement in those discussions paired with his active role in transactions on Craig Avenue and in Lexington, according to the government, demonstrates a reckless disregard for human life and poses a danger to the public. The Court finds this argument persuasive, particularly in light of the specific drugs and quantities at issue.

The government further argues that no release conditions can adequately mitigate Newton's danger to the community. As a "kilogram-level dealer" with associates, Newton would only need a cell phone to facilitate drug transactions. Much of the government's evidence consists of recorded FaceTime calls, underscoring the ease with which the operation was conducted remotely. Courts have recognized that in such circumstances, electronic or location monitoring is ineffective to reduce the risk of danger. *See United States v. Nova*, No. CR 16-060-02 S, 2016 WL 6471205, at

*2 (D.R.I. Nov. 1, 2016) (finding electronic monitoring insufficient to mitigate danger where the defendant could carry out a heroin distribution scheme from home).

The government also notes that Newton is currently serving a term of federal supervision for a prior drug trafficking conviction. His alleged involvement in the instant offense reflects a rapid return to criminal conduct, undermining confidence in his willingness or ability to comply with any conditions of release. Defense counsel argues that Newton has strong family support, stable employment, and has been otherwise compliant while on federal supervision. Thus, any release conditions imposed by the Court would be effective due to Newton's incentive to avoid additional consequences, in light of the instant Indictment and the allegations that he violated the terms of his supervision imposed by the Southern District of Ohio. The Court finds such assurances unconvincing when weighed against the government's clear and convincing evidence of dangerousness. Given the nature of the conduct, the high risk of continued trafficking, and Newton's history, the Court concludes that no condition or combination of conditions will reasonably assure the safety of the community. Accordingly, danger-based detention is required under the BRA.

C. **NEWTON'S RISK OF NONAPPEARANCE**

The United States did not make substantial arguments regarding Newton's risk of nonappearance, except to briefly point out that the penalties he is facing may create an incentive to flee. This argument, however, was insufficient to meet the government's preponderance burden to detain Newton based on a risk of nonappearance given that release in this matter would immediately result in his

arrest on the supervised release violation warrant out of the Southern District of Ohio. Thus, nonappearance-based detention is not proper under the BRA.

## II. CONCLUSION

For the above-stated reasons, the Court finds the United States failed to prove by a preponderance of the evidence that Newton poses a risk of nonappearance but proved by clear and convincing evidence that Newton is an irremediable danger to the community and the Bail Reform Act mandates detention.

The Court has assessed the record, contemplated the risks, evaluated conditions, and determined that no conditions exist that can reasonably assure Newton will not pose a danger to another or the community. Accordingly, the Court **GRANTS** the United States' oral motion for detention and **DETAINS** Defendant Newton.

Signed this the 7th of August, 2025.



MATTHEW A. STINNETT
UNITED STATES MAGISTRATE JUDGE
EASTERN DISTRICT OF KENTUCKY